Baginski *v.* Koziara, Executor, et al.

(No. 888914—Decided September 27, 1972.)

Common Pleas Court of Cuyahoga County.

*Mr. Franklin G. Kochtan* and *Mr. William G. Shields*, for plaintiff.

*Mr. Robert J. Walkowiak*, for defendant.

Hitchcock, J. (By assignment from Paulding County.) Defendant's motion to vacate the order of this court reducing to judgment, over objection, the terms of a settlement arrived at on pre-trial before another judge, on the assertion there was no voluntary agreement, is overruled.

In 1970 plaintiff began this action to recover on a $5,000 promissory note executed by defendant's decedent on October 18, 1965, payable to plaintiff 10 years after date, with interest at 6% per annum. The parties to the note were of Polish ancestry and apparently more familiar with the Polish language than the English. Defendant executor is of Polish ancestry and appears to have a good working, if not fluent, command of the English lan-

guage. The court understands that Mr. Kochtan, plaintiff's attorney and Mr. Walkowiak, defendant's attorney, are both of Polish ancestry and were able to converse with their respective Polish speaking clients in Polish or English. Mr. Shields said he conversed with plaintiff in English in the presence of her son, a bilingual person.

Although plaintiff payee and the decedent maker of the note were friends, were unmarried, and lived together for about 4 years prior to Mrs. Ladniak's death which was followed by defendant's appointment as her executor on June 19, 1970, defendant has refused to honor the note claiming that no consideration passed from plaintiff to decedent at the time the note was executed in a realty office about the time decedent purchased the house in which both ladies lived until Mrs. Ladniak died. Plaintiff asserts that by reason of the note she gave decedent $3,000 cash and 3 years after the note was executed an additional $1,000 she obtained from her son. Plaintiff's counsel assert they possess evidence tending to show plaintiff also gave decedent other money during the time they lived in the house titled solely in decedent's name.

Just what the parties to the note intended to accomplish, and thought they accomplished by it, apparently must now forever remain unknown.

The complaint, filed November 12, 1970, was answered by a general denial and came on for pre-trial conference on June 23, 1972, before the Hon. George J. McMonagle, a resident judge of this court. At the conclusion of the hearing, counsel indicated to the court that the controversy was settled for $2,500, and the judge ordered that appropriate judgment entry be prepared.

Pursuant to the court's instruction plaintiff's counsel prepared and presented to defendant's counsel a judgment entry by reason of the stipulation of settlement. Counsel for defendant refused, on Monday, June 26, 1972, to approve any settlement entry saying that his client thought he had to pay $2,500 because the judge suggested, after hearing both counsel state their respective positions, that such figure would, in his opinion, be a good one for

both parties; but that defendant never really voluntarily offered anything except $1,000 to settle plaintiff's claim. Despite a conference of all counsel with Judge McMonagle on June 27, 1972, no judgment of settlement was arrived at and signed.

On July 5, 1972, plaintiff moved for "an order granting judgment in this matter based upon a settlement agreement reached in this court at Pre-Trial ... in the sum of $2,500.00 with interest from the 23rd day of June, 1972, for reasonable attorney fees for the bringing of this motion, and punitive damages."

This motion was heard by this court on July 13, 1972. The witnesses were (1) defendant; (2) attorneys for plaintiff, William J. Shields, and Franklin G. Kochtan; (3) attorney for defendant, Robert J. Walkowiak, and (4) Hon. George J. McMonagle, judge at the pre-trial hearing.

This court in chambers, at the conclusion of the hearing during the noon hour, disclosed to all counsel its tentative finding for plaintiff, but assured defendant that until 9:15 o'clock A. M., on the day following, being Friday, July 14, 1972, the court would consider any authority indicating that the court's tentative conclusion might be erroneous. Also, that in the absence of such presentation of authority, judgment would issue as per the court's announcement, and the parties were dismissed. At 9:45 o'clock A. M., Friday, July 14, 1972, plaintiff's counsel were present with a proposed judgment entry as defendant had not presented during the 20 hours then ending any authority contra the court's tentative finding or requesting time for such purpose.

Thereupon this court signed a judgment entry overruling the motion for interest from June 23, 1972, and for punitive damages but finding the motion otherwise well taken and directing that plaintiff recover of defendant the settlement sum of $2,500 plus $150 for attorney fees and all at defendant's costs.

On July 22, 1972, defendant filed a motion reciting:

"Now comes the defendant by counsel and moves this court for an order setting aside the alleged settlement

agreement and journal entry thereon, allegedly reached at pretrial on June 23, 1972, for the reasons stated in defendant's brief.''
to which was appended the following:

## "BRIEF

''Counsel for defendant submits the following reasons why the alleged settlement agreement and journal entry thereon should be set aside:

''1. The court failed to rule on defendant's motion to compel answer to interrogatories and the motion for production of documents and things for inspection which was filed on June 23, 1971.

''2. That defendant, with leave of court on July 11, 1972, filed an amended answer denying each and every allegation contained in plaintiff's complaint, nullifying any alleged agreement entered into.

''3. That the alleged settlement agreement was not voluntarily entered into by defendant; that he felt coerced into it because he felt it was the judge who thought that the alleged amount agreed upon was the correct one and that it was not the voluntary thought and act of the defendant.

''4. That neither the defendant nor his attorney signed the alleged journal entry and/or the alleged settlement agreement.

''5. That no release was ever signed by the defendant.

''6. That neither a payment nor any consideration was ever made or given to the defendant under the alleged settlement agreement.

''7. That the trial of the case was never begun and that defendant has never had his day in court.

''The court's attention is directed to the case of *Cummins Diesel Michigan, Inc.,* v. *The Falcon* (1962), 305 F. 2d 721, 723, whereby the court stated that a settlement agreement, or stipulation, *voluntarily entered into* cannot be reputed (*sic*) by either party and will be summarily forced (*sic*) by the court but in the instant case the defendant did not voluntarily enter into any settlement agreement.''

To examine this contention the court caused reporter Doris A. Zielinski to prepare a transcript of the evidence taken at the July 13 hearing in respect to the details of the alleged pre-trial settlement. The record shows the following pertinent testimony:

"I. Hon. George J. McMonagle, Judge, as witness for plaintiff.

"(On direct examination by Mr. Shields beginning at page 32)

"Q. Do you recall a pre-trial hearing held in your Courtroom on June the 23rd, 1972?

"A. Yes.

"Q. Do you recall if all the parties were present?

"A. They all were, yes.

"Q. Was there a settlement agreement reached, to your knowledge, on that date and time?

"A. Yes, there was.

"Q. What was that settlement agreement?

"A. $2,500, to be paid by the defendant—I think he is the executor—to the plaintiff.

"Q. Who was that settlement agreement reached by and between?

"A. Well, everybody was back in the—it was finally arrived at between all the lawyers back in my chambers, together with the defendant. I am not sure the plaintiff was back in chambers at that time. At that time, why, the defendant and his lawyer agreed to the settlement for $2,500.

"Mr. Shields: I have nothing further of this witness."

"(On cross-examination by Mr. Walkowiak beginning on page 33)

"Q. Judge McMonagle, on that date, are you sure that the defendant was in your office?

"A. I am positive he was.

"Q. I mean in the back chambers.

"A. He came back in chambers, sure. I had discussions with you and I had discussions with Mr. Shields and finally I asked you to bring him back in chambers. He was standing alongside of my desk.

"Q. I thought it was the second time that we had the meeting—you called us again—not the first time.

"A. My recollection is that he was there both times. The second time we asked him back particularly because Mr. Shields had said that it was his information from some source that the defendant personally wanted to go through with the settlement but that his lawyer didn't want him to do it. So I brought him back and I asked the defendant whether or not it was his desire not to go through with this arrangement, and he said it was his desire now to go through with it. He was willing to pay a thousand dollars. He wouldn't pay the $2,500 and that it was not solely the lawyer's desire.

"Q. Well, we are talking about a thousand dollar settlement. Do you recall—

"A. You offered a thousand dollars originally. Mr. Shields wanted all, which would come to something like $7,000, added interest on top of it, and finally Mr. Shields and his co-counsel and you were present—at some stage he finally recommended that he would take about $3,500. But between himself and his co-counsel, they finally indicated that they would take $2,500.

"Q. Well, you and I walked out of your chambers, if I recall properly, and you and I were discussing it, and after you discussed it privately with the attorneys for the plaintiff, we walked into the hallway out there and you discussed it, didn't you suggest $2,500 as a more reasonable sum?

"A. Yes, I did. That's right. You came back and at least you said that he would pay it.

"Q. Yes. I wanted to talk to him first and come back to this amount. I talked with him and, of course, when I conveyed that message to him, if you are—

"Mr. Shields: Judge, I am going to object.

"The Court: Just a second. Make your questions as you desire to make them, Mr. Walkowiak."

By Mr. Walkowiak:

"Q. Well, as you understand, both the plaintiff and the defendant are of Polish descent and they speak very

little, if any English. If you recall, did you convey this $2,500 figure to him?

"A. My recollection is that he was back there and the amount was finally settled on this $2,500. That is my recollection.

"Q. And it was your suggestion of the $2,500 instead of a thousand dollars?

"A. As a compromise. I thought that maybe the $2,500 would be a reasonable sum and everybody seemed to agree to it, except I think the next day or the next court day you called and said—

"Q. Wouldn't $3,000 be a reasonable settlement or $2,000?

"A. Whatever sum that competent adults who have able lawyers would finally agree on in a contested matter in my judgment would be a reasonable settlement.

"Q. But you suggested $2,500?

"A. I did.

"Mr. Walkowiak: That is all, your Honor.

"Mr. Shields: I have nothing further."

"(On questioning by this court beginning on page 37)

"The Court: The court has several questions in this particular type of case. As I understand it, the defendant and his counsel and plaintiff's counsel were in your chambers.

"The Witness: That is my recollection.

"The Court: That is your recollection.

"The Witness: The two attorneys—I don't believe that the plaintiff was back in my chambers at that time, but I am not positive about it. My recollection is that she was not but all three lawyers were. We talked about the $2,500 and that finally the defendant also came back there.

"The Court: All right. What do you recall about this suggestion, $2,500?

"The Witness: It was probably that I suggested it, if I understand your question correctly. It was a matter of some compromise. My recollection is I think they finally

said that they would pay $1,700—from the thousand dollars to $1,700 and they were talking $3,500 and having consideration for some problems, I guess, in this case, but the $2,500 was probably my suggestion, if that is what your question is, sir.

"The Court: Assuming you made this suggestion—apparently all agree that you made this suggestion. That amount was discussed by counsel; is that correct?

"The Witness: Well, that's right.

"The Court: What I am interested in, what do you recall that the defendant and his lawyer said to you after that suggestion was made? That is what I am particularly interested in. What is your recollection about that at this time?

"The Witness: Well, there is no question at all in my mind of the lawyer saying that they would do it, and it is my recollection that the defendant himself did come back in chambers and this information was conveyed to him and his lawyer talked to him and that he also agreed at this time. Now, I could be just mistaken about him being back at that time but he definitely was back at least on one occasion and at least the information was conveyed to me by his lawyer. No question about that they said they would do it.

"The Court: After the suggestion was made?

"The Witness: Oh, yes.

"The Court: All right. That is all. Any other questions that counsel wishes to address to the judge?

"Mr. Shields: I have no further questions, your Honor."

"(On further cross-examination by Mr. Walkowiak beginning on page 39)

"Mr. Walkowiak: Well, if you recall, I think that I talked to the defendant and Mr. Kochtan and Mr. Shields were in your office and I came back and the defendant never came to your office.

"The Witness: Well, you see so many people on these pre-trials. My recollection is that he did come back and the amount was talked about but it could be on the subse-

quent occasion, but there is no question in my mind that when everybody left the courtroom that day, the plaintiff and the defendant and all the lawyers understood the case was settled for $2,500.

"The Court: All right.

"Mr. Walkowiak: That is all, your Honor.

"Mr. Shields: Thank you very much.

"The Court: You are excused, Judge."

"II. Mr. Edward Koziara, defendant, as Executor of the Estate of Katherine Ladniak, deceased, as witness in own behalf.

"(On direct examination by Mr. Walkowiak beginning at page 18.)

"Q. Were you present at a pre-trial hearing on June 23, 1972, before Judge McMonagle?

"A. Yes.

"Q. Now, at this pre-trial hearing it was suggested, I believe—I don't know by whom—that we would settle this case for about a thousand dollars; is this correct?

"A. Yes.

"Q. For a thousand dollars?

"A. Thousand dollars, yes.

"Q. Now, you were willing to settle this case for a thousand dollars, as I recall, but then Judge McMonagle suggested $2,500; is that correct?

"A. Yes.

"Q. Now, you were under the impression that you were settling for a thousand dollars; is this correct?

"A. Yes.

"Q. You did make this agreement voluntarily; is this correct?

"A. Yes.

"Q. In other words, you were willing to settle for the thousand dollars?

"A. Thousand dollars.

"Q. But not for the $2,500. Was this a misunderstanding on your part?

"A. No, just—

"Q. Did you understand my question?

"A. Yes.

"Q. Now, Judge McMonagle suggested $2,500. Do you remember that?

"A. Yes, $2,000—$2,500 the most.

"Q. But you thought that you had to settle for that; is this correct?

"A. Yes.

"Q. It was a must?

"A. Must, yes.

"Q. But you were willing to settle for a thousand dollars and that was all?

"A. That's right."

"(On cross-examination by Mr. Shields beginning on page 20.)

"Q. Did you talk to Judge McMonagle on the 23rd of June?

"A. Yes.

"Q. Did Mr. Walkowiak come up to Judge McMonagle's chambers and talk to you?

"A. Yes.

"Q. Did he discuss with you a settlement figure of $2,500?

"A. Yes, the most.

"Q. That was the maximum sum that you were going to enter into; is that correct? You weren't going to settle for more than $2,500?

"A. No.

"Q. You did settle for $2,500, didn't you?

"A. No.

"Q. Well, did you authorize Mr. Walkowiak to settle for $2,500?

"A. The most.

"Q. That was the most.

"A. Most.

"Q. And you told Mr. Walkowiak that it couldn't be more than $2,500, didn't you, that the most was $2,500?

"A. No.

"Q. You did not tell him that?

"A. No.

"Q. Who told him that?

"A. The most $2,500?

"Q. Right. You said that you would settle for more than $2,500; is that correct?

"A. No, $1,000.

"Q. $1,000. Well, where did the figure $2,500 come into the picture?

"Mr. Walkowiak: Do you understand the question?

"Q. When you said $2,500 the most, who were you talking to? Why are you looking at your lawyer? Look at me.

"Mr. Walkowiak: He doesn't understand the question.

"Mr. Shields: If he doesn't understand the question, I think he is capable of telling us so.

"Mr. Walkowiak: If you don't understand the question—

"Mr. Shields: Mr. Walkowiak, will you let me cross-examine him.

"Mr. Walkowiak: I want to make sure that he understands the question.

"The Court: What was the last question addressed to the witness?

"(Thereupon the last question was read by the reporter.)

"The Witness: You talking to me?

"The Court: Yes. That question was for you.

"The Witness: My lawyer come for me—my lawyer come to me and said the Judge said $2,500.

"*By Mr. Shields*:

"Q. The Judge said $2,500; is that what I heard you say?

"A. Yes.

"Q. All right. Now did Mr. Walkowiak tell you that Judge McMonagle ordered $2,500?

"A. Yes.

"Q. Do you know what ordered means?

"A. I say no.

26

"Q. All right.. I don't want to confuse you.

"Mr. Walkowiak: He doesn't understand the question.

"Q. Let's go back to June the 23rd. Let's go back to the day we appeared in Judge McMonagle's office. Do you remember us all meeting in the judge's room?

"A. Yes.

"Q. Judge McMonagle was sitting behind a big table and we were all sitting around, Mr. Kochtan and myself and Mr. Walkowiak.

"A. Yes.

"Q. Did you come into that room and talk to Judge McMonagle?

"A. Yes.

"Q. Now, did you come in and shake Judge McMonagle's hand? You don't recall. All right..

"Mr. Walkowiak: Did you understand the question?

"The Witness: No.

"Mr. Shields: I don't really know—

"The Court: Just a second. What did he ask you just now?

"The Witness: Ask me did I talk to $2,500. I talk to the most, $2,500.

"The Court: Well, now, the last question before you was this: He said, when you came into that room, did you shake Judge McMonagle's hand. Do you understand that question?

"The Witness: Yes.

"The Court: Do you remember the answer to it?

"The Witness: No, I don't remember.

"The Court: You don't remember. All right.

"*By Mr. Shields*:

"Q. Now—

"A. I don't know.

"Q. Do you remember your lawyer talking to you that day, Mr. Walkowiak?

"A.. What talk to me?

"Q. Did he talk to you? Did Mr. Walkowiak ask you questions?

"A. What question? I don't know.

"Q. Well, did he ask you any questions?

"A. I don't know what question.

"Q. Did he talk to you? Did he come out of Judge McMonagle's room and talk to you in the hallway?

"A. Yes.

"Q. What did he talk about?

"A. He come aside and talk to me. Talk to me $2,500 the most. I told him no.

"Q. All right. You told him no?

"A. No.

"Q. When did you tell him this?

"A. What?

"Q. When did you tell him this?

"A. This time I talk to him. I don't know, I don't remember everything. I mark it down, I remember it. I don't remember everything.

"Q. But you do remember telling Mr. Walkowiak no?

"A. No.

"Q. Did you ever tell him yes, $2,500.

"A. I no tell him yes, $2,500.

"Q. How much did you agree to give him?

"A. A thousand dollars. That is all I tell him, a thousand dollars. Just a thousand dollars.

"Q. Was Mr. Walkowiak your lawyer that day?

"A. What?

"Q. Was he your lawyer?

"A. He?

"Q. Yes.

"A. I got him.

"Q. Now, what do you mean by $2,500 the most?

"A. Well, talk to me $2,500 the most. I talked to him no.

"Q. You told him no. You never told him yes that day?

"A. No.

"Mr. Shields: All right. I have nothing further of this witness, judge."

"III. Mr. Robert J. Walkowiak, counsel for defendant, as witness called by plaintiff.

"(On direct examination by Mr. Shields, beginning on page 28.)

"Q. Calling your attention to June 23rd, 1972, were you representing the defendant?

"A. I was.

"Q. Did you appear in the chambers of Judge Mc-Monagle?

"A. I did.

"Q. Did you represent to the court that you had the consent of your client that you would settle this case for $2,500?

"A. Well—

"Q. Just yes or no, sir.

"The Court: You can qualify your answer, but I think it should be generally answered yes or no.

"A. Generally, yes.

"Q. Are you now telling this court that you did not have your client's consent?

"A. Well, conditionally. He didn't seem to understand the situation.

"Q. Are you telling the court that you made a representation to a judge of this court, as an officer of this court, that you did not have the authority of your client to enter into that agreement?

"A. Well, my client felt that it was sort of an order, after we tried to settle for the thousand dollars, and then Judge McMonagle suggested this $2,500. Well, he thought that it was a must.

"Q. But he did agree, didn't he?

"A. Then he agreed because he felt that he had to.

"Q. And you carried that agreement to Judge McMonagle?

"A. That's right.

"Mr. Shields: I have nothing further of this witness, your Honor. Yes, I do. I am sorry.

"*By Mr. Shields:*

"Q. You read and write and you are familiar with the Polish language?

"A. Considerably, yes.

"Q. And so is the defendant?

"A. The Polish language?

"Q. Yes.

"A. Yes.

"Q. And you conversed at this time, on the 23rd of June, with your client in the Polish language; you both understood each other?

"A. Both English and Polish, yes, but he felt that he wasn't settling voluntarily. He still wanted—

"Q. You didn't hit him with a club?

"A. Well, no, but the words were sort of an order for this $2,500.

"Q. This is what you conveyed to your client, not what Judge McMonagle—

"A. Well, Judge McMonagle suggested the $2,500. He thought the thousand dollars was too small.

"Q. And you conveyed that to your client?

"A. Right.

"Q. And he understood you, did he not?

"A. Yes.

"Q. And you understood him?

"A. Yes.

"Q. And he agreed to the $2,500; isn't that correct?

"A. Well, not voluntarily but he agreed.

"Q. You didn't threaten him with any punishment?

"A. No.

"Q. You didn't twist his arm, under duress?

"A. No.

"Q. You acted in a professional capacity?

"A. That's right.

"Mr. Shields: All right. I have nothing further, your Honor."

Nothing in the testimony negatives the fact that after an unhurried pre-trial discussion with the judge (who suggested a dollar figure for settlement which all counsel knew to be only a suggestion) counsel conferred privately with their clients and thereafter returned to the judge's chambers and informed him that their respective clients accepted his suggestion and the matter was settled. Conse-

quently, this court finds nothing in the record at odds with its recollection of the testimony, and that its judgment of July 14, 1972 (filed with the clerk July 17, 1972) is correct.

Now defendant says he thought Judge McMonagle's suggestion was an order to settle the case for $2,500, not merely a suggestion. If so, the fault was that of his counsel who was well able to converse with his client, and needed no interpreter to do so. It should never be forgotten that our law provides for interpreters when necessary to administer justice for the benefit of any person who cannot speak English. See R. C. 1903.19, 2301.12 (A), 2301.14, and 2335.09. For counsel to renege on an unequivocal settlement figure freely made in open court at a pre-trial conference, is, in the opinion of this court "a shabby thing" not to be condoned in an officer of the court. Moreover, such conduct is so unjustifiable and mischievous that an award of attorney fees for the time and effort of counsel necessary to obtain judgment for the amount of settlement figure is eminently appropriate. The uncontroverted testimony was that the reasonable value of such services in this case was $160, a figure this court reduced to $150.

When defendant's counsel and plaintiff's counsel both told Judge McMonagle, at the conclusion of a regular pretrial conference, that the litigation was settled for $2,500 it was terminated except for the preparation and signing of an appropriate judgment entry. Such settlement was voluntary as neither plaintiff's counsel nor defendant's counsel was under any restraint or threat to tell the judge his client agreed to any settlement figure if such were not a fact.

Consequently, there was, thereafter, neither point, occasion nor reason to consider items 1, 2, 6 and 7 listed in defendant's brief.

As to item 3, whatever may have been the actual understanding and position of the defendant as to the binding nature of Judge McMonagle's suggestion, it is clear he was not coerced by the judge and his counsel well knew there was nothing coercive or mandatory about the judge's suggestion. One of the principal reasons for holding pre-trial

conferences is to effect settlements when that is possible and it is a true trial judge's responsibility to suggest, particularly after hearing counsel advance what they believe to be the merits of their respective causes, possible solutions. To contend that such a suggestion, considered privately thereafter by a party and his attorney, after which it is announced openly to the court as agreed to by counsel for every party, is involuntary as coercive and does not constitute a complete voluntary settlement is, in the opinion of this court, ridiculous. Such a rule of law would make insecure and doubtful thousands of settlements arrived at upon pre-trial. Such doctrine is completely at odds with the ancient policy of encouraging settlements. This policy is just as salutary in the administration of justice as it ever was, and perhaps more so considering today's volume of litigation.

As to items 4 and 5 there is no necessity that any judgment entry be signed by counsel or release executed by a party in respect to the terms of a settlement orally reported to the court by the learned counsel of all parties at a regularly scheduled pre-trial conference after a full and deliberate discussion of the case.

The citation by defendant of *Cummins Diesel Michigan, Inc.,* v. *The Falcon et al.* (1962) (C. C. A. 7), 305 F. 2d 721, in support of his motion seems fanciful indeed. There 5 parties participated in a series of pre-trial conferences. At the final conference the clerk made entry in the record of the pre-trial proceedings, "Wright accepts court's recommended settlement figure" on November 17, 1961. On December 4, 1961, Wright informed the court it repudiated the settlement agreement. Although the report gives no details of the precise representations made at any of the pre-trial conferences, Wright was held to its bargain as it doubtless should have been, absent any trickery or mutual mistake of fact as a factor in the settlement arrived at.

Counsel know that on July 14 or 15, 1972, the court read *Spercel* v. *Sterling Industries* (July 5, 1972), 31 Ohio St. 2d 36, and became fully convinced that it had correctly signed the judgment entry submitted on July 14, 1972,

and would have been entitled to have made such entry *nunc pro tunc* as of June 23, 1972. Also, that Judge McMonagle would have been fully justified in signing a judgment entry on June 23 at the time all counsel reported the settlement agreement to him, or at any later time. As plaintiff is not complaining of the loss of interest for 20 odd days, the judgment made will not be disturbed.

Concerning the award of attorney fees it seems the conduct of counsel for defendant here might well be found contemptuous as a violation of R. C. 2705.02, reading:

"A person guilty of any of the following acts may be punished as for a contempt:

"(B) Misbehavior of an officer of the court in the performance of his official duties, or in his official transactions;"

See *State* v. *Buser* (1970), 25 Ohio Misc. 179.

Now either defendant did agree to the $2,500 settlement which Mr. Walkowiak reported to Judge McMonagle or he did not. He now says he did but he thought he had to only because Judge McMonagle suggested such a figure and consequently no voluntary contract of settlement was consummated. If this be so, and the testimony is not unequivocally certain, then the fault was that of Mr. Walkowiak in not making clear to his client that the judge's suggestion was no order of compelling force.

As a matter of salutary public policy I perceive attorneys must be held to their clearly established communications to a court made at any proper hearing the court has jurisdiction to hold. When they repudiate such communications after good faith acceptance by the court and opposing counsel the substance of such act is as unjustifiable as the disobedience of an order of injunction or an order to pay child support, two situations where attorney fees are commonly allowed as "expenses" and/or "costs." See *State, ex rel. Bruns Coal Co.,* v. *Compton* (1953), 96 Ohio App. 541, appeal dismissed, 160 Ohio St. 320; *Tramte* v. *Tramte* (1950), 61 Ohio Law Abs. 497.

Whatever the merits of such differences as may exist between defendant and his counsel it is clear that plaintiff has acted honorably and she and her attorneys have been

put to unjustifiable trouble to obtain judgment in respect to a settlement reached at a properly conducted pre-trial conference.

A judgment entry overruling defendant's motion to vacate and set aside its judgment entry filed July 17, 1972, is filed herewith.

*Motion to vacate overruled.*